IN THE UNTIED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| PABLO QUIÑONES and CARLOS AYALA, <br><br>Plaintiffs, <br><br>v. <br><br>METRO SANTURCE, INC. or, alternatively, JOHN DOE CORPORATION d/b/a HOSPITAL PAVIA SANTURCE; DR. SANDRA ROSARIO LEBRÓN and her husband JOHN DOE, each of them personally and on behalf of their conjugal partnership; JANE ROE and her husband RICHARD ROE, each of them personally and on behalf of their conjugal partnership; JOHN DOES 1-10; and UNKNOWN INSURANCE COMPANIES 1-10. <br><br>Defendants. | CIVIL NO.: <br><br><br>PLAINTIFFS DEMAND TRIAL BY JURY |

## COMPLAINT

**TO THE HONORABLE COURT:**

Plaintiffs Pablo Quiñones and Carlos Ayala, through their undersigned attorneys, respectfully state and pray as follows:

### Jurisdiction and Venue

1. The events or omissions giving rise to the claims set forth in this action all occurred within the District of Puerto Rico and the Commonwealth of Puerto Rico.

2. Federal jurisdiction in this case is attained under diversity pursuant to section 1332 of Title 28, United States Code. Venue is appropriate in this judicial district pursuant to section 1391(b) of Title 28, United States Code.

3. The matter in controversy exceeds, exclusive of interest and costs, the sum of $75,000.

## Parties

4. Plaintiffs Pablo Quiñones ("Mr. Quiñones") and Carlos Ayala ("Mr. Ayala") are the sons of decedent Lydia Quiñones Toledo. They are citizens and residents of New Jersey and Nevada, respectively.

5. Defendant Metro Santurce, Inc. or, alternatively, John Doe Corporation d/b/a Hospital Pavía Santurce, ("Pavía Hospital") is a corporation organized under the laws of the Commonwealth of Puerto Rico, which has its principal place of business in Puerto Rico. Pavía Hospital is the owner and/or operator of a hospital of the same name located in Santurce, San Juan, Puerto Rico.

6. Defendant Dr. Sandra Rosario Lebrón ("Dr. Rosario") is a medical doctor, married to defendant John Doe and with him constituting a conjugal partnership, who at all times relevant to this claim was employed by and/or had medical privileges at Pavía Hospital, where she practiced medicine and provided medical treatment to the late Lydia Quiñones Toledo. Dr. Rosario is a citizen and resident of the Commonwealth of Puerto Rico.

7. Defendant Dr. Jane Roe ("Dr. Roe") is an infectious disease doctor whose true identity is currently unknown, married to defendant Richard Roe and with him constituting a conjugal partnership, who at all times relevant to this claim was employed by and/or had medical privileges at Pavía Hospital, where she practiced medicine and provided medical treatment to the late Lydia Quiñones Toledo. Dr. Roe is a citizen and resident of the Commonwealth of Puerto Rico.

8. All of the other defendants are also citizens and residents of the Commonwealth of Puerto Rico. John Does 1-10 are individuals and/or corporations whose identities are presently unknown and whose negligent acts or omissions caused

-3-

or contributed to the damages claimed herein.

9.  Unknown Insurance Companies 1-10 are insurers whose identities are presently unknown and who insured the aforementioned defendants. These insurers are jointly responsible with their respective insureds for the damages claimed herein pursuant to section 2003 of Title 26 of the Annotated Laws of Puerto Rico.

### Factual Allegations

10.  Lydia Quiñones Toledo ("Lydia") was a single mother of three children, namely the plaintiffs and Hortencia Quiñones (Mrs. Quiñones). On or about August 9, 2011, Mr. Quiñones and his family arrived in Puerto Rico to celebrate Lydia's birthday and to assist her in traveling to Santurce for a medical appointment. On or about August 11, 2011, a day before her 72nd birthday, Lydia went to Pavía Hospital for cardiovascular testing based upon a referral by her primary care physician, Dr. Rivera Gutierrez. On August 11, 2011, Lydia underwent a catheterization procedure performed by Dr. Miguel Campos Esteve ("Dr. Campos").

11.  Following the heart catheterization procedure on August 11th, Dr. Campos informed Lydia and Mr. Quiñones that three primary arteries of her heart were severely clogged and recommended that Lydia undergo open heart surgery as soon as possible.

12.  That same day, Dr. Campos prescribed heart medication to Lydia and made an appointment for her to meet with, Dr. Rolando Colón Pérez ("Dr. Colón"), a cardiovascular and thoracic surgeon and the director of the cardiovascular surgery department at Pavía Hospital, on Monday, August 15, 2011. Plaintiff Carlos Ayala, a physician in the United States Air Force then stationed in Afghanistan to treat U.S. soldiers and civilians, obtained a family emergency leave to travel to Puerto Rico for his mother's medical appointment and possible future surgery.

-4-

13. On August 15th, Dr. Colón examined Lydia and also determined that she needed heart surgery as soon as possible. Dr. Colón then sent Lydia for a battery of preoperative tests on that same day and scheduled Lydia for open heart surgery at Pavía Hospital on the next day.

14. On August 16, 2011, Lydia underwent open heart surgery, involving a three vessel coronary bypass graft. After the surgery, Lydia was transferred to the cardiac surgery intensive care unit ("ICU") at approximately 2:00 p.m. on minimal inotropic support (epinephrine), where she was connected to a ventilator, given a blood transfusion, and had her blood drawn for arterial blood gas (ABG) analysis. ABG analysis is typically used to measure the amount of oxygen in a patient's blood when determining the extent of needed ventilator support. Dr. Sandra Rosario Lebrón ("Dr. Rosario"), a staff pulmonologist at Pavía Hospital, was assigned to care for Lydia and was notified of the ABG results.

15. On August 16, 2011, at approximately 8:15 p.m., Dr. Rosario ordered the respiratory therapy personnel at Pavía Hospital to set Lydia's ventilator rate at 4 breaths per minute. Dr. Rosario also ordered that ABG's be taken 30 minutes later. The nurses' notes indicate that, at about that time, Lydia was suffering a great deal of pain and that pain medication was ordered.

16. On August 16, 2011, at approximately 9:00 p.m., Lydia's ABG results were reported to Dr. Rosario, who indicated that ABG's should be taken again in 30 minutes and that Lydia should be placed on continuous positive air pressure ventilation (CPAP). Nevertheless, ABG's were not taken at 9:30 p.m. as ordered.

17. At approximately 9:30 p.m., on August 16, 2011, Dr. Rosario called Pavía Hospital's respiratory therapy personnel and ordered them to extubate Lydia and to

place her on a ventilatory mask with oxygen at 50 percent concentration. Dr. Rosario also ordered that ABG's be taken again.

18. Per Dr. Rosario's orders and in her absence, Pavía Hospital's respiratory personnel extubated Lydia at 9:35 p.m. on August 16th. The nurses' notes indicate that upon extubation Lydia immediately displayed hypertension and agitated breathing with abdominal muscle utilization.

19. Dr. Rosario was contacted by telephone and informed of Lydia's distressed condition, to which Dr. Rosario responded by ordering that Lydia be placed in biphasic positive airway pressure (BPAP) ventilation mode.

20. At approximately 9:50 p.m. on August 16th, Dr. Colón evaluated Lydia and ordered that she be re-intubated. The nursing staff called Dr. Rosario by telephone and informed her of Dr. Colón's orders. Dr. Rosario then authorized the re-intubation and later, at 11:30 p.m., evaluated Lydia in person. During the re-intubation, Pavía Hospital's medical staff introduced bacteria into Lydia's lungs.

21. As a result of the careless extubation and need for immediate re-intubation of Lydia by the Pavía Hospital medical staff, Lydia suffered severe respiratory complications and developed acute respiratory distress syndrome (ARDS). Following this serious incident, Lydia's medical care was transferred to another pulmonologist, Dr. Garcia ("Dr. Garcia"), who was reluctant to respond to Mr. Quiñones and Mr. Ayala's questions about Lydia's deteriorating medical condition and referred them to Dr. Rosario for an explanation. Shortly thereafter, Dr. Garcia transferred Lydia's respiratory care to another pulmonologist, Dr. Maximo Blondet ("Dr. Blondet").

22. Lydia's systemic condition continued to deteriorate, with ensuing pulmonary and kidney failure together with a diminished heart rate. By August 24,

2011, Lydia's condition worsened to the point that the medical staff contacted her children to request that they come to the hospital immediately because Lydia may not survive past that day.

23. Lydia did survive that day, but Pavía Hospital's medical staff continued to subject Lydia to additional negligent medical care and treatment, causing Lydia to develop, among other things, acute quadriplegic myopathy and a fungal infection in her blood, which Pavía Hospital identified as the immediate cause of her death. As a result of the severe respiratory complications caused by Pavía Hospital medical staff, Lydia was subjected to, among other things, prolonged mechanical ventilation, prolonged sedation, additional intubations and extubations, a tracheotomy, and broad spectrum intravenous (IV) antibiotics, which caused increased susceptibility to nosocomial (hospital-acquired) bacterial and fungal infections.

24. For example, on or about August 25, 2011, Pavía Hospital's medical staff noticed that Lydia had a pleural effusion, essentially a buildup of fluid between the layers of tissue that line the lungs and chest cavity, and ordered a CT scan of her chest using a contrast fluid. During this procedure, Pavía Hospital's medical staff discovered that they had improperly installed Lydia's central IV line a few days earlier because the IV contrast fluid improperly spread into Lydia chest cavity and over her recently operated heart. This same improperly placed central IV line was being used by ICU nursing staff to provide necessary medications to Lydia.

25. Additionally, during the efforts to treat the pneumonia Pavía Hospital had caused Lydia, Pavía Hospital's medical staff subjected Lydia to broad spectrum antibiotics. Mr. Ayala expressed his concerns to Dr. Jose A. Caldera Nieves ("Dr. Caldera") about the long-term use of broad spectrum antibiotics and the need for fungal

infection prophylactic treatment if they continued to use the antibiotics. Dr. Caldera informed Mr. Ayala that Dr. Jane Roe, an infectious disease doctor whom allegedly was also Dr. Blondet's wife, was in charge of Lydia's antibiotic treatment and that he would relay Mr. Ayala's concerns to her. Despite the potential risks associated with administering long-term antibiotic treatment, Pavía Hospital's medical staff failed to properly administer prophylactic antifungal medications or appropriately narrow her antibiotic coverage. Subsequently, Lydia developed a fungal infection in her blood, which eventually and in combination with the other negligent care she received, led to her premature demise.

26. Furthermore, on September 6, 2011, the day that Lydia underwent a tracheotomy, Mr. Quiñones visited his mother in the ICU. On that day, Mr. Quiñones found his mother under visible stress and in poor condition. He reported his concerns that same day to Dr. Colón. Mr. Quiñones told Dr. Colón that the tracheotomy tube, which had been installed that day to assist her breathing, was disconnected from the ventilator and that no one in the ICU noticed that Lydia was having trouble breathing. Mr. Quiñones also expressed concern with the poor quality of care his mother was receiving and her worsening condition, noting, for example, that Lydia's pneumatic socks were filthy and causing bruises from being placed on her legs too tightly; that Lydia had lesions oozing fluid; and that Lydia appeared extremely swollen and bloated. Dr. Colón provided the names of several hospital officials to whom Mr. Quiñones could report the poor care Lydia was receiving in the ICU.

27. On September 8, 2011, Pavía Hospital's medical staff drained fluid from Lydia's left lung and, on the next day, began to wean her from the ventilator. Lydia appeared to be improving and remained off the ventilator from September 15, 2011, to

September 19, 2011. Yet, Pavía Hospital's medical staff kept Lydia in the ICU because she still had a slight pneumonia in her right lung and placed her back on the ventilator. By September 21, 2011, both Dr. Caldera and Dr. Blondet indicated that Lydia's pneumonia has cleared and that Lydia would soon be transferred from the ICU to a regular room. That same day, Mr. Quiñones returned to his home in New Jersey.

28. After Mr. Quiñones left Puerto Rico, Pavía Hospital medical staff still kept Lydia in the ICU with ventilator assisted breathing, mainly at night, during the remainder of her hospitalization. Moreover, Pavía Hospital medical staff further prolonged Lydia's stay in the ICU by subjecting her to another surgical procedure -- the surgical implantation of a pacemaker -- despite Dr. Campos having told Mr. Quiñones before he departed that Lydia did not need a pacemaker.

29. On October 14, 2011, at approximately 11:10 a.m., Dr. Caldera called Mr. Ayala, who had also returned home, to tell him that his mother had a fungal infection in her blood and was not doing well. Dr. Campos later called Mr. Quiñones and advised him that due to Lydia's severe complications his mother may not survive that day.

30. Lydia died on October 14, 2011, before her sons Pablo Quiñones and Carlos Ayala could return to Puerto Rico.

31. Lydia's family learned that, during the period in which Pavía Hospital kept Lydia in the ICU, several patients had succumb to nosocomial infections acquired in the ICU.

32. As a result of the defendants' negligence, Lydia unnecessarily endured severe physical and emotional pain and suffering, which was entirely avoidable given her known condition and the established medical standards, protocols and means available to the doctors and the hospital where she was being attended to. Ultimately,

as a result of the negligence of defendants, Lydia prematurely lost her life.

33. Her family, including her sons, plaintiffs Pablo Quiñones and Carlos Ayala, helplessly witnessed Lydia's rapid deterioration and eventual demise. Pablo Quiñones and Carlos Ayala have lost their mother, an irreplaceable part of their lives. This loss has caused great emotional pain, suffering, and damages to plaintiffs and their family.

34. Lydia's death was a result of the professional negligence of Pavía Hospital and its medical and nursing staff, including defendants Dr. Rosario and Dr. Roe, all of whom departed from the medical standards of care and otherwise failed to act in a prudent, reasonable or responsible manner in the medical treatment provided to Lydia.

35. Indeed, defendants' failure to keep Lydia on mechanical ventilation after a coronary artery bypass and ordering her extubation less than 12 hours after surgery, without a proper evaluation, is a departure that constitutes gross negligence.

36. Additionally, defendants' departures from the medical standards and/or professional negligence include, but are not limited to:

(a) rushed extubation leading to ARDS and further complications;

(b) failure to perform a proper medical evaluation of the patient after the initial extubation and before ordering the patient receive mechanical ventilation;

(c) ordering mechanical ventilation on an inappropriate ventilatory modality given the patient's clinical circumstances;

(d) failure to adequately monitor the patient in order to avoid subclinical aspiration events;

(e) failure to adequately monitor the patient in order to ensure proper medical and nursing care;

(f) failure to recognize that the long-term use of broad spectrum antibiotics

-10-

would cause increased susceptibility to nosocomial bacterial and fungal infections in the ICU;

(g)  failure to protect the patient from exposure to infections in the ICU;

(h)  prolonged use of high dose steroids and sedatives;

(i)  failure to recognize that prolonged use of the ventilator diminished the patient's muscle tone exacerbating the ARDS that she developed within 48 hours from being initially extubated; and,

(j)  failure to ensure that Pavía Hospital's ICU facilities are free from bacteria and fungi that generate nosocomial infections, despite being aware that nosocomial infections had caused multiple patient deaths in its ICU.

37.  Lydia Quiñones Toledo's physical and emotional damages, including her physical and mental pain, anguish and suffering prior to her death, caused by defendants' negligence while at Pavía Hospital, are valued at a sum in excess of $2,000,000.

38.  As her heirs, plaintiffs Pablo Quiñones and Carlos Ayala claim the physical and emotional damages suffered by their mother.

39.  Plaintiffs Pablo Quiñones and Carlos Ayala have individually suffered and will continue to suffer grave emotional damages and mental anguish due to the unnecessary and premature loss of their mother. Their damages are valued at a sum in excess of $2,000,000 for each.

40.  Defendants, including their respective insurers, are jointly and severally liable for the negligence and damages described in this complaint.

-11-

## COUNT I

### (Medical Malpractice and Vicarious Liability - 31 L.P.R.A. §§ 5141 and 5142)

41. Paragraphs 1 through 40 of this Complaint are incorporated by reference as if fully set forth herein.

42. Defendants Pavía Hospital, its nursing and medical staff, including Dr. Sandra Rosario Lebrón and Dr. Roe, and John Does 1-10 (collectively, "Defendants"), had a duty to provide medical care to Lydia that complied with the applicable standards of the medical profession. Notwithstanding that duty, the Defendants breached that duty as set forth above.

43. Pavía Hospital is further vicariously liable for the negligent acts and/or omissions committed by the defendants on their medical and nursing staff in the care and treatment of Lydia Quiñones Toledo, as well as for its own negligence in the selection, monitoring, supervision and granting of privileges to said doctors and nurses, including Dr. Sandra Rosario Lebrón, Dr. Roe and the individual John Doe defendants.

44. There is a clear and direct causal link between the medical malpractice and/or negligence of the Defendants and the damages sustained by Plaintiffs, as set forth above.

## COUNT II

### (Direct Action Against Insurers - 26 L.P.R.A. § 2003)

45. Paragraphs 1 through 44 of this Complaint are incorporated by reference as if fully set forth herein.

46. Defendants Unknown Insurance Companies 1-10 have a contractual obligation to compensate those who are damaged by the medical errors and omissions of defendants Pavía Hospital and its nursing and medical staff, including defendant Dr.

Sandra Rosario Lebrón, Dr. Roe, and John Does 1-10. As set forth above, the Defendants in Count One committed medical malpractice and/or negligence with respect to Lydia Quiñones Toledo. Moreover, there is a clear and direct causal link between this misconduct and the damages sustained by plaintiffs, as set forth above.

47.  Under 26 L.P.R.A. § 2003, plaintiffs have a right to assert claims directly against the corresponding insurers of defendants Pavía Hospital, its nursing and medical staff, including defendant Dr. Sandra Rosario Lebrón, Dr. Roe, and John Does 1-10.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs respectfully request that the Court enter final judgment against defendants:

1.  Declaring defendants to be in violation of 32 L.P.R.A. §§ 5141 and 5142, and 26 L.P.R.A. § 2003.

2.  Finding defendants jointly and severally liable to plaintiffs for the damages sustained by plaintiffs and their mother, in an amount in excess of $6,000,000 plus applicable interest and costs.

3.  Awarding plaintiffs such other and further relief at law or in equity as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues triable of right by a jury in the complaint set forth above.

-13-

**RESPECTFULLY SUBMITTED,**

In San Juan, Puerto Rico, this 13th day of August, 2012.

**LAW OFFICES DAVID EFRON, PC**
*Attorneys for Plaintiffs*
PO Box 29314
San Juan, PR 00929-0314
Tel.: (787) 753-6455
Fax: (787) 758-5515
efron@davidefronlaw.com

By: _____
DAVID EFRON
USDC-PR 125701